**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| |
|---|
| ALKALI SCIENTIFIC, INC., |
| Plaintiff, |
| v. |
| AX CAPITAL, INC., KEITH XU a/k/a KE E. XU a/k/a XU KE, and DOES 1 through 10, |
| Defendants. |

Case No. 22-cv-6469
JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, ALKALI SCIENTIFIC, INC. ("ALKALI" or "Plaintiff"), by and through its undersigned counsel, FISHERBROYLES, LLP, brings this action against AX CAPITAL, INC., KEITH XU a/k/a KE E. XU a/k/a XU KE, and DOES 1 through 10, and states and alleges the following:

## DESCRIPTION OF THE ACTION

1.      As the COVID-19 pandemic wreaked havoc on the world in 2020, governments and private organizations scrambled to provide lifesaving personal protective equipment to their citizens and workers – particularly to front-line healthcare and safety workers – who, due to their occupations, were especially vulnerable to falling victim to the virus because of their continued contact with large numbers of people.  King County in Washington State was no exception, and in November, 2021, King County issued a solicitation for 500,000 N95 masks.  Plaintiff ALKALI was awarded a contract by King County to provide 500,000 3M brand authentic N95 Masks for a delivered price of $2,449,975.

2.     Unfortunately, when there is great need there are also those who seek to prey on those in need, like Defendants AX CAPITAL, INC. (hereafter, "AX"), KEITH XU a/k/a KE E. XU a/k/a XU KE (hereafter, "XU"), co-conspirators MIN QI WANG, a/k/a MINQI WANG, a/k/a MITCH WANG, a/k/a MITCH WANGANG, (hereafter, "WANG"), his related companies, EHDS INTERNATIONAL LLC and EHDSTECH, INC. (hereafter, "EHDS INTL." and "EHDSTECH"), and unknown co-defendants DOES 1 through 10.  After learning that ALKALI sought large quantities of 3M N95 masks to satisfy the King County order, Defendants and their co-conspirators sought to induce ALKALI to purchase counterfeit 3M N95 masks, and did sell counterfeit 3M N95 masks to ALKALI in large quantities.

3.     Defendants and their co-conspirators engaged in an enterprise to convince ALKALI that they could provide genuine 3M Company ("3M") N95 masks which would satisfy the King County contract.  To do this they engaged in extensive written communications with ALKALI personnel described more fully below, and provided photographs of the masks and their packaging which showed apparently authentic 3M logos.  WANG represented that he, through EHDS INTL. and/or EHDSTECH, was an authorized 3M dealer.  Further, WANG and XU made verbal representations that the masks being sold by their respective companies were authentic prior to and also when they were inspected by ALKALI prior to purchase.

4.     The representations that the masks were made by 3M were false.  None of the masks were made by 3M.

5.     In reliance on these false representations, ALKALI purchased a total of 437,200 counterfeit 3M N95 model 1860 masks from Defendants and WANG for a total of USD $1,434,500.

6.      All of the masks purchased by ALKALI, operating from Florida, came from Defendants in New York and their co-conspirators in Maryland, and were shipped to King County, Washington.  Beginning on or about February 11, 2021, U.S. Customs and Border Protection ("CBP") seized all the masks in King County's possession as counterfeit.  The masks were seized and subject to forfeiture by CBP under the provisions of 18 U.S.C. § 981(a)(1), 18 U.S.C. § 1956(c)(7)(D), 18 U.S.C. § 1961(1)(B), and 18 U.S.C. § 2320 for trafficking in counterfeit trademarks.

7.      To date, neither Defendants nor their co-conspirators have reimbursed Plaintiff ALKALI for the $1,434,500 it paid for the counterfeit masks seized by CBP despite ALKALI's demands for reimbursement.  Nor, have Defendants compensated ALKALI for its lost profits on the cancelled sale of the $2,449,975 worth of seized masks despite ALKALI's demand that they do so.

8.      Accordingly, ALKALI herein asserts claims for: (i) breach of contract; (ii) fraudulent inducement; (iii) unjust enrichment; and (iv) breach of implied warranty of merchantability.

## PARTIES

9.      Plaintiff ALKALI SCIENTIFIC, INC. is an Iowa corporation with its principal place of business at 5370 NW 35th Terrace, Suite 112, Fort Lauderdale, FL 33309.  ALKALI is in the business, among other things, of buying and selling medical devices and personal protective equipment to hospitals, other healthcare providers and government customers around the United States.

10.      Defendant AX is a Delaware corporation with its principal place of business at 220 Ingraham Street, #1B, Brooklyn, New York.  A REGISTERED AGENT, INC. is listed as

the registered agent for AX, with an address at 8 The Green, Ste. A, Dover, Delaware 19901.

AX is in the business of importing and distributing merchandise including PPE sold to hospitals

and healthcare providers around the United States.

11.     Upon information and belief, Defendant KEITH XU a/k/a KE E. XU a/k/a XU

KE is an individual resident of New York, New York and is a manager and/or owner of AX.  XU

is believed to reside at 10623 Ditmars Boulevard, First Floor, East Elmhurst, New York.

12.     The true names and capacities of defendants DOES 1 through 10, whether

individual, plural, corporate, partnership, associate, or otherwise are unknown to Plaintiff.  The

full extent of the facts linking said DOE defendants to the causes of action alleged herein are

unknown to Plaintiff at this time.

## JURISDICTION AND VENUE

13.     The causes of action asserted in this Complaint arise from the sale of counterfeit

3M N95 masks to ALKALI by Defendants.

14.     This Court has personal jurisdiction over Defendants AX and XU because AX is

resident in the Eastern District of the District of New York, and AX has its principal place of

business and warehouse in the Eastern District of New York.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties, and the

amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331.

17.     The Court further has original jurisdiction and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all the claims herein are so related that they form part of the same case or controversy.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because Defendants AX and XU are subject to personal jurisdiction in this District.

## FACTS

19.     On December 1, 2020, Plaintiff ALKALI was awarded a contract to provide King County, Washington with 500,000 N95 Health Care Particulate Respirator and Surgical Masks, for a delivered price of USD $2,449,975.

20.     In December 2020, ALKALI contacted WANG by telephone inquiring whether WANG could provide N95 masks so that ALKALI could fulfill its contract with King County. WANG informed ALKALI that his company was an authorized 3M dealer.  WANG knew or should have known that the masks were intended to be sold by ALKALI to be used as PPE by public safety personnel working for King County, Washington.

21.     As will be shown below, ALKALI made one purchase of masks from WANG and two purchases of masks from Defendants.  On December 30, 2020, ALKALI purchased 12,000 masks from WANG for USD $39,200.  On January 6, 2021, ALKALI purchased 260,000 masks from AX for USD $858,000.  On January 24, 2021, ALKALI purchased 165,200 masks from AX for USD $536,900.

22.     Upon information and belief, WANG and XU conspired together to defraud ALKALI by claiming the masks being sold were authentic 3M masks when in fact they were not.

23.     AX and XU acted in concert with WANG to convince ALKALI to purchase counterfeit N95 masks for delivery to King County.  AX, XU and WANG acted as co-

conspirators in this regard.  During the course of this conspiracy, WANG was resident in Maryland and XU was resident in New York.

24.     As detailed below, WANG provided repeated written confirmation that the masks were genuine 3M N95 masks.

25.     XU and other AX personnel provided verbal assurances of the authenticity of the masks being offered to ALKALI when ALKALI personnel visited the AX warehouse in Brooklyn, New York, on January 5, 2021 and January 24, 2021.

26.     Upon information and belief, Defendants knew that the masks being offered to ALKALI were not in fact made by 3M, but were imported from a non-3M manufacturer overseas.  Upon information and belief, the masks were actually made in and shipped from the People's Republic of China.

27.     Upon information and belief, the masks were imported into the United States by AX or one of its affiliate companies.

28.     Upon information and belief, after importation the masks were stored in AX's warehouse located at 223 Varick St., Brooklyn, New York 11237.  Ax shipped masks from that warehouse to WANG's warehouse in Baltimore, Maryland to complete WANG's sale of masks to ALKALI.

<u>**WRITTEN COMMUNICATIONS**</u>

29.     On December 29, 2020, and at other times, WANG gave written assurances via text messages and emails to ALKALI that the N95 masks for sale were authentic N95 masks manufactured by 3M, of St. Paul, Minnesota, the leading N95 mask maker worldwide.

30.     On December 29, 2020 and December 31, 2020, WANG sent photographs by text messages to one of ALKALI's managers, Jason Arbinger ("Arbinger"), showing packaging and labeling of 3M model 1860 N95 masks.

31.     On December 29, 2020, to induce ALKALI to purchase the purported 3M Model 1860 N95 masks, WANG wrote to Arbinger: "Jason, 3M 1860 N95 arrived this afternoon.  See the packages and specs. Mitch".  WANG also wrote: "This is original 3M packaging."

32.     On December 29, 2020, WANG wrote to Arbinger: "I got word that 200,000 [masks] will arrive this week, and 100,000 will arrive early next week."

33.     On or about December 24, 2020, ALKALI wired USD $39,600 in payment to WANG for the first shipment of 12,000 3M masks sold directly by WANG through EHDS INTL. and/or EHDSTECH.

34.     On December 30, 2020, WANG completed the sale of 12,000 purported N95 masks to ALKALI, by packing and shipping the boxes of masks to ALKALI's customer, King County.

35.     Upon information and belief, WANG obtained the 12,000 masks sold to ALKALI on December 30, 2020 from AX and XU.

36.     On January 1, 2021, ALKALI invoiced King County for 500,000 N95 masks in expectation of delivering under the King County contract.

37.     On January 2, 2021, the shipment of the first 12,000 masks arrived in King County, Washington.

38.     On December 31, 2020, WANG provided additional assurances to ALKALI that the masks Defendants sold to ALKALI were made by 3M.  WANG sent additional photos of

stacks of boxes marked "3M".  WANG also sent photos of the lot number of the masks and a picture of a mask clearly marked "3M".

39.     On December 31, 2020, WANG assured ALKALI that ALKALI's order for an additional 300,000 masks would soon be available.  WANG advised Arbinger: "there are 190,000 pieces landed in NY as of now, the remaining 110,000 will arrive next week.  It is probably too late to arrange the pickup today as tomorrow is the new year."

40.     Arbinger responded to WANG: "Let's move on the 190K.  Can you give payment needs/timing you expect."  WANG replied: "It is too late to wire the funds today.  You can do so Monday and pick up on Monday.  This is the same brand and the same price."

41.     On January 3, 2021, WANG wrote to Arbinger: "it is better off that you will come to NY distribution center, inspect, pay and take the product.  As of last Friday, 190,000 arrived, by the end of Monday, more are expected to arrive making the total of 250,000 to 300,000."  WANG wrote further: "If these look agreeable to you, I will forward the address of the center, their routing/account, and arrange the meeting time.  Mitch".

42.     Arbinger replied: "Hi Mitch. I received this.  Things change often.  Anyways let's work on this."  WANG replied further: "Well, the change is primarily the pickup location.  For most cases, we do so in our warehouse so that we can work on the shipping or pickup, arranging the inspection and flexibility of payment… I think that by doing it direct with the distribution center, it would reduce the burden of logistics on both ends."

43.     At this point, Arbinger believed that WANG was seeking to introduce a third party (XU/AX) into the sale of the masks.  WANG sought to obfuscate and convince Arbinger to complete the purchase.  On January 3, 2021, Arbinger wrote:

> Hi Mitch : thank [sic] for all your work on this.  We can come to a NY
> distribution ctr, inspect and pickup.  All Payments, terms and arrangements are

with you alone. :-) We are your customer.  We are paying you.  We cannot
negotiate with anyone else.  Returns are not expected.  No logistics are needed.
Just a pick up address w. ready pallets.  You are introducing a third party, it
seems.  Please clarify as you can.

44.     Later on January 3, 2021, WANG replied:

Hi Jason, understand your points here.  One thing I'd like to assure you is that
there will be no new negotiations.  If you are not comfortable with submitting
your payment before picking up the product, you come and inspect first before
payment.  You could bring a cashiers check if you prefer.  If you are not happy
with the quality of the product, there are no obligations to buy anything.  You are
a preferred customer, we want to protect your company.

45.     Arbinger wrote back: "Pls clarify, I'm paying a different company and not paying

you?  I thought we were buying these from you . . as you are a [3M] dealer and so on."

46.     The party to whom Arbinger was referring was Defendants AX and/or XU.

WANG replied to Arbinger's concerns on January 3, 2021, by affirming to Arbinger that WANG

and AX/XU were partners and that ALKALI's purchase was legitimate by "guaranteeing"

ALKALI's funds with those of EHDS INTL. and/or EHDSTECH.  WANG stated: "We are

business partners.  I can guarantee your funds with our company funds and assets."

47.     On January 4, 2021, WANG wrote to Arbinger: "As of this noon, more products

have arrived making the total quantity to be 300,000.  There is no obligation on how many you

want to take.  The max is 300,000."

48.     Arbinger replied: "Thank you.  We have our eye on 260K.  We will not inspect

more than that quantity, tomorrow."  WANG replied: "Got it. Thank you!"

49.     On January 4, 2021, Arbinger wrote to WANG: "Mitch, what is the latest?"

WANG replied: "I am waiting for the response from m [sic] business partners and will let you

know as soon as I have the info."  WANG then informed Arbinger to contact XU, giving XU's

phone number and the address of AX's warehouse in Brooklyn, New York, as well as payment

routing instructions to AX's bank account.  WANG made further representations to XU's

reliability, writing to Arbinger: "I know Mr Xu has been in business for many years and is a reputable person."

50.     On January 5, 2021, ALKALI representatives visited the AX warehouse in Brooklyn and inspected the masks.  WANG wrote to Arbinger: "the agreement is that you inspect without any financial obligations, but once you are happy with the product as Ryan called me and said '..good and real…' you need to pay before you can take the product away.  Please do so immediately.  Thank you!"

51.     Later on January 5, 2021, WANG wrote to Arbinger: "Jason, you did not release the funds.  You have to go to the bank to release the funds.  This happened to me the last time when you wired the funds but did not release it, we did not get the funds until several days later.  Please do so asap.  Otherwise the driver will get stuck at the warehouse.  Thank you!"

52.     When payment did not go through immediately, WANG informed Arbinger: "I am unable to convince the seller to let the driver take the product away and wait for the payment."  WANG further stated: "We came to a solution.  That is to have our attorney draft a letter and have you sign it to honor the payment."

53.     WANG sent a letter to Arbinger on January 5, 2021 which acknowledged receipt and acceptance of the products by ALKALI.  Arbinger signed the letter and returned it to WANG.

54.     On January 5 and 6, 2021, XU texted Arbinger multiple times regarding the wire transfer then in progress between ALKALI and AX.

55.     On January 5, 2021, upon the urging of XU and WANG, ALKALI transferred by wire payment USD $858,000 to the account of AX in payment for receipt of what proved to be 260,000 counterfeit masks.

56.     On January 6, 2021, WANG wrote to Arbinger:  "I am so sorry for yesterday's transfer mess.  I had no slightest doubt about you and tried to convince Xu to let the driver take the product and the funds would come.  Finally I had my attorney create a letter to resolve it.  The driver was able to drive away without having to stay there overnight."

57.     On January 6, 2021, in reliance on the written and oral statements by Defendants concerning the authenticity of the purported 3M N95 masks, ALKALI purchased 260,000 counterfeit N95 masks from Defendants believing them to be authentic 3M N95 masks.

58.     On January 12, 2021, King County received the shipment of 260,000 masks.

59.     On January 22, 2021, WANG arranged the third purchase of N95 masks by writing to Arbinger: "165,120 3M 1860 N95 will be ready for pickup Monday.  The warehouse, brand and the price ($3.3) are the same. . . . If you confirm to purchase, we will set the product aside for you and provide the account/routing numbers.  Thank you!  Mitch."

60.     On January 25, 2021, WANG coerced Arbinger to commit to purchase the purported 3M N95 masks when he wrote: "If you do not inspect and purchase, another buyer has come and wanted to purchase.  If you confirm buy or not, I will make decisions accordingly.  Thank You!  Mitch".  WANG continually conflated himself, EHDSTECH, and EHDS INTL. with XU and AX on the two large mask sales.

61.     On January 25, 2021, in reliance on the written and oral statements by Defendants concerning the authenticity of the purported 3M N95 masks, ALKALI transferred USD $536,900 by wire payment to AX's bank account in payment for the third shipment of purported 3M N95 masks.

62.     On January 27, 2021, WANG wrote to Arbinger that: "Xu and I are business partners and we share resources and share gains, we do not cut each other out."

63.     On January 27, 2021, ALKALI issued a purchase order to AX for 425,200 masks in the amount of USD $1,394,900.

64.     As with the lot of 260,000 counterfeit masks, ALKALI picked up the lot of 165,200 counterfeit masks from AX's warehouse in New York and then shipped the masks purchased from Defendants to King County, Washington in fulfilment of its December 1, 2020 contract with King County.  The third shipment of masks arrived at a King County facility on February 1, 2021.

65.     The masks purchased from Defendants were not in fact made by 3M and did not meet the N95 masks specifications.  The masks were packaged in boxes bearing 3M trademarks and documentation.  The masks also themselves bore 3M trademarks even though they were in fact counterfeit.

66.     Upon information and belief, Defendants and WANG knew that the masks being sold were not made by 3M and, thus, were counterfeit 3M N95 masks.

67.     Upon information and belief, Defendants and WANG agreed to jointly misrepresent the masks as 3M N95 masks, when they knew that they were not made by 3M and did not meet N95 specifications.

68.     Upon information and belief, Defendants agreed to share in the proceeds of the purchase of masks by ALKALI with their co-conspirators WANG and EHDS, and did share in the proceeds of their joint efforts to defraud ALKALI by selling counterfeit masks as authentic 3M N95 masks.

69.     On or about February 8, 2021, King County telephoned Arbinger to inform ALKALI that the masks sold by ALKALI to King County were believed to be counterfeit.

70.     On or about February 11, 2021, CBP began seizing the masks from King County.

71.     On or about February 20, 2021, Arbinger telephoned WANG to tell him that the masks were counterfeit and had been seized by CBP.  Arbinger thus revoked acceptance of the masks purchased from Defendants.

72.     On March 22, 2021, King County informed ALKALI by email that CBP had seized all the masks delivered to King County as counterfeit, and that they would not pay for any of the masks that had been shipped.

73.     On March 30, 2021, CBP informed ALKALI that the masks had been seized as counterfeit and in violation of trademarks.

74.     ALKALI revoked its acceptance of the masks in communications with WANG in February 2021, as well as by letters transmitted to WANG on August 27, 2021 and to AX and XU on September 15, 2021.

75.     XU and WANG acted in concert with and through AX, EHDSTECH and EHDS INTL. and DOES 1 through 10 to traffic in counterfeit trademarked goods to ALKALI and others by fraudulently misrepresenting that the N95 masks they were offering were genuine 3M Model 1860 N95 masks.  Defendant AX and co-conspirator EHDSTECH received wire transfers of funds from ALKALI pursuant to this scheme.

76.     XU and WANG acted in concert with and through AX, EHDSTECH and EHDS INTL. and DOES 1 through 10 in an enterprise to traffic counterfeit trademarked goods by fraudulently misrepresenting the authenticity of masks and PPE sold to buyers throughout the United States.  Defendants, and each of them, effected this scheme through a series of related acts that posed and continue to pose a threat of criminal activity.  The continued sale of counterfeit PPE and masks has an ongoing effect on all the end users of the counterfeit masks who falsely believe they will be adequately protected from transmission of the COVID-19 virus,

13

77.     In this regard, AX has been sued in Texas for selling counterfeit PPE masks to another buyer under case *Social Medical Supply, LLC v. AX Capital LLC*, Cause No. DC-21-06032, Dallas County District Court, Texas (the "Texas Action").  AX CAPITAL, INC. has appeared in that action to contest the default judgment entered against there-captioned defendant AX Capital LLC.  In its filings in that action, AX has admitted that it provides the masks in question to hospitals and other healthcare facilities.

78.     AX is an importing and distribution company that imports and sells, among other things, PPE and masks such as the counterfeit 3M N95 masks involved in this action, and the masks involved in the Texas Action.  AX acted in concert with XU to form an enterprise engaged in fraudulently selling counterfeit masks to unsuspecting buyers.

79.     Defendants' continuing business efforts to import, sell and distribute PPE and masks, including at the very least selling the counterfeit 3M N95 masks which were offered to but not purchased by ALKALI in this case, throughout the United States constitute an ongoing enterprise or scheme or the threat of such a continuing scheme.

80.     Selling counterfeit masks to ALKALI constitutes a part of Defendants' way of conducting its regular and ongoing otherwise legitimate businesses.  In the Texas Action, Defendant AX has admitted that AX provides the products in question to hospitals and other healthcare facilities.

81.     XU and co-conspirator WANG provided written and verbal assurances of the authenticity of the masks being offered to ALKALI when they knew or should have known that the masks were not in fact made by 3M.

82.     For example, on December 29, 2020, to induce ALKALI to purchase the purported 3M N95 masks WANG wrote to Arbinger: "Jason, 3M 1860 N95 arrived this

afternoon.  See the packages and specs.  Mitch".  WANG also wrote: "This is original 3M packaging."

83.     AX and XU acted in concert with WANG and the other Defendants to convince ALKALI to purchase counterfeit N95 masks for delivery to King County.  AX, XU and WANG acted as co-conspirators in this regard.

84.     The masks purchased from and through Defendants were not in fact made by 3M and did not meet the Model 1860 N95 mask specifications.  The masks were packaged in boxes bearing 3M trademarks and documentation.  The masks also themselves bore 3M trademarks even though they were in fact counterfeit.

85.     AX, XU and WANG were directly responsible for the seizure of the masks as counterfeit by CBP because they were the source of the counterfeit masks that were seized.

86.     ALKALI's damages are directly related to the intentional misrepresentation of the counterfeit masks as genuine by WANG, AX and XU as part of their enterprise.

87.     The sale of counterfeit masks by Defendants affected interstate commerce because the masks were purchased by a corporation in Florida from entities in Maryland and New York, and said masks were shipped from Maryland and New York to Washington state.

88.     ALKALI is a legal person which sustained injury to its business by the loss of the $1,434,500 paid to Defendants and their co-conspirators, and the refusal by King County to pay for the masks which had been delivered.  These losses are directly attributable to the actions of Defendants in intentionally misrepresenting that the masks were genuine, and by their selling counterfeit masks to ALKALI.

89.     AX, XU and WANG engaged in an enterprise designed to defraud customers interested in purchasing authentic 3M N95 masks and other PPE by instead selling counterfeit masks and other PPE.

90.     At the time of the transactions described herein, AX, XU and WANG had thousands of counterfeit 3M N95 masks in their possession which they offered to supply to ALKALI but which ALKALI declined to purchase.

91.     Upon information and belief, in addition to the sales of counterfeit 3M N95 masks sold to ALKALI, AX, XU and WANG engaged in an ongoing continuous enterprise to fraudulently sell counterfeit 3M N95 masks to other customers in substantial quantities, which enterprise has continued to the present day and will extend into the future.  This enterprise includes presently unknown overseas entities responsible for the manufacture and export to the United States of counterfeit masks for sale to U.S. customers.

92.     Given the extreme public health issues surrounding the COVID pandemic, Defendants' actions selling hundreds of thousands of counterfeit N95 masks in this case, fraudulent PPE masks in the Texas Action, their efforts to sell the other counterfeit 3M N95 masks offered to ALKALI to other persons, as well as their ongoing business selling these and other related PPE items, which we believe include similar counterfeit N95 masks, constitute ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.

## COUNT ONE – BREACH OF CONTRACT

93.     Paragraphs 1 through 92 are hereby incorporated by reference.

94.     ALKALI entered into two agreements to purchase 425,200 purported 3M N95 masks from Defendants.

95.     ALKALI paid Defendants USD $1,394,900 for the purported 3M N95 masks.

96.     The masks delivered by Defendants to ALKALI were not actually made by 3M.

97.     ALKALI revoked its acceptance of the masks.

98.     All of the masks purchased from Defendants were seized by CBP as counterfeit and cannot be returned to Defendants as a result.

99.     In material breach of each of the contracts, Defendants failed to perform in accordance with the terms of said contract to deliver N95 masks made by 3M.

100.    As a direct result of Defendants' breaches, ALKALI has suffered significant damages, including the cost of the masks purchased from and through Defendants, lost profits, lost future sales, and the destruction of its business relationship with King County, Washington.

101.    Wherefore, ALKALI demands judgment in its favor against Defendants in the amount of USD $1,394,900, which represents the cost of the masks as paid by ALKALI, plus lost profits in an amount to be determined, incidental and consequential damages in an amount to be determined, prejudgment interest, and costs of this action.

## COUNT TWO – FRAUDULENT INDUCEMENT

102.    Paragraphs 1 through 101 are hereby incorporated by reference.

103.    Defendants knew that ALKALI's customer King County required 3M N95 masks.

104.    In the course of their dealings with ALKALI, Defendants and their co-conspirators intentionally made false representations that the masks purchased by ALKALI were authentic 3M N95 masks.

105.    Defendants knew these statements to be false when made, or the representations were made with reckless indifference to their truth, because the masks being offered and which were sold to ALKALI and provided by Defendants were not made by 3M.

106.     Defendants made material misrepresentations with the intent to deceive ALKALI.

107.     Among such misrepresentations by Defendants were photographs provided to ALKALI by co-conspirator WANG of purported 3M masks and their packaging before the purchases were made by ALKALI.

108.     Defendants presented the fraudulent masks and their packaging to ALKALI personnel for inspection, at which time they asserted and confirmed that the masks were actually made by 3M, which statements were in fact false.

109.     Co-conspirator WANG asserted to ALKALI that his company was an authorized distributor for 3M and that his company distributed genuine 3M masks through its business partner, AX.

110.     Defendants knew that these representations were false when they were made, or they made such statements in reckless disregard to the truth as to be equivalent to actual knowledge of falsity.

111.     When Defendants made the aforementioned statements, they intended for ALKALI to rely upon their representations.

112.     The misrepresentations were material to ALKALI, and Defendants knew or should have known that ALKALI would rely on those representations in entering into contracts to fulfill ALKALI's contract with King County and performing its obligations thereunder.

113.     As a direct and proximate result of Defendants' fraudulent misrepresentations, ALKALI has suffered actual and other damages.

114.     ALKALI had the right to and did reasonably rely on the representations and would not have purchased the masks were it not for the representations that the masks were genuine and made by 3M.

115.     As a direct and proximate result of Defendants' fraudulent misrepresentations, ALKALI has suffered significant damages, including, but not limited to, the loss of the USD $2,225,000 sale of masks to King County, Washington and the termination of ALKALI's business relationship with King County.

116.     WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $1,394,900 for actual damages, which represents the cost of the masks purchased from Defendants as paid by ALKALI, plus the profit which ALKALI lost when the sale was cancelled by King County, which amount remains to be determined, plus punitive damages, reasonable attorney's fees, prejudgment interest, and costs of this action.

## COUNT THREE – UNJUST ENRICHMENT

117.     Paragraphs 1 through 116 are hereby incorporated by reference.

118.     On January 5, 2021 and January 25, 2021, ALKALI entered into agreements with Defendants for the purchase of 3M Model 1860 N95 masks.

119.     On January 5, 2021 and January 25, 2021, Defendants delivered the masks to ALKALI.

120.     In exchange, ALKALI paid Defendants USD $1,394,900.

121.     The masks provided were not genuine 3M N95 masks.

122.     Beginning on or about February 11, 2021, CBP seized the masks as counterfeit.

123.     The payment by ALKALI to Defendants for said masks constituted a benefit to Defendants.

124.     Defendants requested, knowingly accepted, and made use of the funds provided by ALKALI.

125.    Should Defendants be allowed to retain the proceeds from this sale of counterfeit masks to ALKALI, Defendants would be unjustly enriched in an amount equal to approximately $1,394,900.

126.    Despite demand, Defendants have failed and refused to recognize their obligations to ALKALI.  As a result, the sum of approximately $1,394,900 remains justly due and owing from Defendants to ALKALI, and it would be against equity and good conscience to permit the Defendants to retain the value of the benefit conferred by ALKALI in exchange for counterfeit goods knowingly sold by Defendants.

127.    WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $1,394,900 for actual damages which represents the cost of the masks as paid by ALKALI, plus reasonable attorney's fees, prejudgment interest, and costs of this action.

## COUNT FOUR – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

128.    Paragraphs 1 through 127 are hereby incorporated by reference.

129.    Defendants are "merchants" and masks are "goods" withing the meaning of New York Uniform Commercial Code ("UCC") §§ 2-104 and 2-105.  Defendants were distributors and sellers of masks.  Defendants sold purported 3M N95 masks to ALKALI.

130.    Defendants impliedly warranted that the masks sold were merchantable, fit for the ordinary purpose for which they were sold or used, were of fair or average quality so as to pass without objection in the trade, and conformed to Defendants' own affirmations regarding their authenticity and being manufactured by and pursuant to the standards of 3M Company.

131.    Pursuant to New York UCC § 2-314, a warranty that the masks were in merchantable condition as 3M Model 1860 N95 masks was implied by law in the sale of the product.

132.    The masks were not made by 3M and were not 3M Model 1860 N95 masks.

133.    Defendants breached their implied warranty of merchantability because the masks did not conform to Defendants' affirmations regarding their authenticity and being manufactured by and pursuant to the standards of 3M Company, fit for the ordinary purpose for which they were sold or used, and were of fair or average quality so as to pass without objection in the trade.

134.    At all times that Defendants warranted and affirmed that the masks were authentic 3M Model 1860 N95 masks and sold the masks, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop selling the masks.

135.    WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $1,394,900 for the cost of the masks as paid by ALKALI, plus lost profits in an amount to be determined, plus punitive damages, reasonable attorney's fees, prejudgment interest, and costs of this action.

## JURY DEMAND

136.     ALKALI respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ALKALI respectfully requests that this Court render judgment, as follows:

        a.   Judgment in Plaintiff's favor and against Defendants on all causes of action alleged herein;

        b.   Damages in an amount to be determined at trial;

        c.   Punitive damages;

        d.   Prejudgment interest;

    e.   Costs of suit incurred herein;

    f.   Attorney's fees; and,

    g.   Such other and further relief as the Court may deem to be just and proper.


Dated: October 25, 2022
       New York, N.Y.


                  **FISHERBROYLES, LLP**


                  By:_____/s/_____
                  Christopher Pey
                  FisherBroyles, LLP
                  445 Park Avenue, Ninth Floor
                  New York, N.Y. 10022
                  Telephone 646-233-2533
                  Chris.pey@fisherbroyles.com
                  *Attorneys for Plaintiff ALKALI SCIENTIFIC, INC.*